***********
Upon review of the competent evidence of record, with reference to the errors assigned, and considering the briefs and oral arguments of the parties, the Full Commission finds no good grounds to receive further evidence, or to rehear the parties or their representatives. Upon reconsideration of the evidence, the Full Commission affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into at the hearing as:
 STIPULATIONS *Page 2 
1. The parties are subject to the provisions of the North Carolina Workers' Compensation Act.
2. On August 15, 2007, an employment relationship existed between the parties. At all times relevant to these proceedings, Defendant was a duly qualified self-insurer.
3. Defendant accepted Plaintiff's claim for her August 15, 2007 workers' compensation injury by accident to the left thigh. Defendant denied Plaintiff's claims for her injuries to her left knee, hip, and back as unrelated to her August 15, 2007 workers' compensation injury by accident.
4. On August 15, 2007, Plaintiff's average weekly wage was $784.65, yielding a compensation rate of $523.13.
5. Plaintiff and Defendant reserve the right to have independent medical examinations.
6. 7. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits:
 a. Stipulated Exhibit One: Plaintiff's medical records;
 b. Stipulated Exhibit Two: North Carolina Industrial Commission forms and filings;
 c. Plaintiff's Exhibit One: Plaintiff's personnel file;
 d. Plaintiff's Exhibit Two: Discovery responses;
 e. Plaintiff's Exhibit Three: Photographs of Plaintiff's left thigh injury;
 f. Plaintiff's Exhibit Four: Plaintiff's Notice of Award from the Social Security Administration;
 g. Plaintiff's Exhibit Five: Plaintiff's list of medications. *Page 3 
 *********** ISSUES
The issues to be determined are:
1. Whether Plaintiff's left knee, hip, and back complaints are compensable consequences of her August 15, 2007 work injury?
2. Whether Plaintiff is entitled to any further workers' compensation benefits?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 59 years old, with a date of birth of December 1, 1951, and is married with three adult children. Plaintiff has a high school general equivalency diploma and an associate's degree in business administration. Plaintiff's college studies included courses in accounting and computers.
2. Plaintiff started working in September 1975 for Defendant, who makes intravenous solutions for shipment and sale. Throughout Plaintiff's employment with Defendant, she worked as bag printer, filling operator, material handler, senior material handler, and production technician, and received extensive on-the-job training in the areas of leadership and supervisory skills. From September 24, 2001 until Plaintiff's retirement on August 31, 2007, she worked as a production technician, and supervised the work of others. Plaintiff consistently received excellent employment evaluations and monetary raises for her attendance, good communication skills, helpfulness to others, increased production, and reduced errors. *Page 4 
3. On August 15, 2007, Plaintiff was working for Defendant performing her usual duties as a production technician. As Plaintiff was bending over to retrieve a roll of stretch wrap near the conveyor belt at her work area, she had her earplugs in and did not hear the automated guided vehicle near her start up. When Plaintiff realized that the automated guided vehicle was coming toward her, she stood up, and when she stepped back, the front bumper of the vehicle hit her lower left leg just above the ankle, causing the vehicle to stop. When she attempted to step back to get out of the way of the automated guided vehicle, the weight of her body was no longer there to keep the vehicle from moving toward her, and it then moved forward, pinning her between the vehicle and the conveyor belt. A sharp, metal surface of the conveyor belt hit and pinned Plaintiff's inner left leg between it and the automated guided vehicle. According to Plaintiff, the specific area of her left leg being pinned between the conveyor belt and the automated guided vehicle was the inside of her leg starting at her knee and running approximately five inches above her knee.
4. It took several minutes to extricate Plaintiff from between the automated guided vehicle and the conveyor belt. The automated guided vehicle was so heavy that a forklift had to be used to pick it up. During the process of removing the automated guided vehicle with the forklift, some of Plaintiff's co-workers held her up so that she would not pass out from the pain. Once Plaintiff's co-workers removed the automated guided vehicle, she went numb, but was still conscious. Shortly after being extricated from between the automated guided vehicle and the conveyor belt, Plaintiff presented to Ms. Gloria Biddix Hall, an occupational nurse and Defendant's medical department manager. According to Ms. Hall, Plaintiff had a wound to her left thigh above the knee. The Full Commission finds Plaintiff's description of how her August 15, 2007 work injury occurred to be credible. *Page 5 
5. Later in the day on August 15, 2007, Plaintiff presented to Dr. Peter George Mangone, an orthopaedist, for treatment. Plaintiff completed a questionnaire wherein she reported an injury to the muscles of her left knee and thigh. Dr. Mangone noted that Plaintiff had a laceration of her left antero-lateral thigh with swelling, and diagnosed an internal degloving-type injury of the left thigh.
6. On August 16, 2007, Dr. Mangone performed an outpatient surgical debridement of Plaintiff's left thigh, which consisted of extensive irrigation and layered closure of the six centimeter laceration. Dr. Mangone released Plaintiff to return to sedentary work with Defendant. Plaintiff returned to work that same day.
7. For the first week following Plaintiff's release to return to work on August 16, 2007, she reported to the nurse's station in Defendant's medical department and slept there long enough to count as being present for a workday so that she could receive her full pay and prevent her August 15, 2007 work injury from counting as a "lost-time accident." According to Plaintiff, one of Defendant's employees would come with a wheelchair and get her out of her car, roll her to a bed in the medical department, and she would sleep for a few hours and then leave. After the first week, Plaintiff was assigned sedentary-duty work with Defendant for the next week to 10 days, until her pre-planned retirement on August 31, 2007.
8. Through the end of October 2007, Dr. Mangone continued to treat Plaintiff, and then referred her to a plastic surgeon for further treatment. On November 1, 2007, Dr. Laurence Ian Arnold, a plastic surgeon, assumed care of Plaintiff. Dr. Arnold determined that Plaintiff's left thigh wound was a "nonhealing wound" with necrotic tissue, and also noted that she had problems with ambulation due to arthritis. On November 2, 2007, Dr. Arnold performed further outpatient surgical debridement on Plaintiff and discharged her with instructions for use of a *Page 6 
wound vacuum (wound vac). Dr. Arnold did not issue any work restrictions related to the November 2, 2007 outpatient surgery; however, Plaintiff was not working at the time.
9. Plaintiff continued to experience pain after the November 2, 2007 outpatient surgery. Sometime in December 2007, Plaintiff reported hip and back pain to Dr. Arnold, who advised her to see an orthopaedist if her symptoms persisted. On December 20, 2007, Plaintiff reported left hip and back pain to Ms. Judy Willis, her nurse case manager at the time, who was coordinating Plaintiff's medical treatment.
10. Defendant did not file a Form 60 admission of liability for Plaintiff's injury to her thigh, but did pay for medical treatment for the thigh and stipulated in the Pre-Trial Agreement that Plaintiff's thigh injury was compensable. Defendant denied that Plaintiff injured her back, left knee, and left hip as a result of her August 15, 2007 work injury.
11. Dr. Arnold continued to monitor Plaintiff's recovery. On January 4, 2008, Dr. Arnold performed a skin graft, after Plaintiff's left thigh injury formed sufficient wound granulation. From January 4, 2008 through January 8, 2008, Plaintiff was hospitalized, recovering from her skin graft surgery.
12. On January 15, 2008, Plaintiff returned to Dr. Arnold at which time he noted her pain assessment was zero on a zero to ten pain scale. On January 31, 2008, Plaintiff saw Dr. Arnold again and continued to have no pain complaints. Dr. Arnold noted Plaintiff's subjective concerns at this time as "nothing wound related." Dr. Arnold released Plaintiff from his care with instructions to return on an as-needed basis, without any permanent work restrictions.
13. After Plaintiff's release from Dr. Arnold, Ms. Vicki Sigmon, another nurse case manager, arranged for an evaluation with Dr. James Christopher Karegeannes, an orthopaedist, for Plaintiff's complaints of left hip pain. On February 19, 2008, Plaintiff presented to Dr. Karegeannes *Page 7 
with complaints of lower back and left buttock pain. A physical examination revealed full and painless range of motion of the left hip. Dr. Karegeannes obtained x-rays of the left hip and lumbar spine, which revealed no acute abnormalities, and which he interpreted as revealing degenerative arthritic conditions, including a slip of the L-3 on the L-4 vertebrae. Dr. Karegeannes recommended lumbar magnetic resonance imaging (MRI) and a referral to a "non-operational spine physician" for possible cortisone injections, but Defendant denied any further medical treatment for Plaintiff's back or left hip.
14. On March 14, 2008, Plaintiff presented to Dr. Joseph Taylor Turnbull, a family medicine specialist and her long-time primary care physician. Dr. Turnbull reviewed x-rays of Plaintiff's knees, which revealed degenerative osteoarthritic changes in the left and right knees. A physical examination revealed crepitation with flexion and extension, and enlarged knees. Dr. Turnbull diagnosed Plaintiff with osteoarthritis and prescribed Arthrotec, an arthritis medication. However, Plaintiff's medical records prior to her August 15, 2007 work injury indicated that she had been taking arthritis medication consistently for over a year and a half.
15. Plaintiff had preexisting bilateral knee pain for which she had received treatment from Dr. Turnbull. On February 14, 2006, Plaintiff reported to Dr. Turnbull experiencing pain, popping, and cracking with knee flexion. A physical examination revealed patello-femoral crepitation. Also in February 2006, Dr. Turnbull noted complaints of "difficulties with Plaintiff's knees."
16. On March 20, 2008, Plaintiff returned to Dr. Turnbull with complaints of bi-lateral knee and now left hip pain, and was walking with a limp. Dr. Turnbull saw Plaintiff on six occasions between March 20, 2008 and August 6, 2009. There are no recorded complaints of *Page 8 
hip or back pain after the March 20, 2008 office visit through August 6, 2009, and Dr. Turnbull's medical records indicate a "normal inspection" of the back upon physical examination.
17. Upon being presented with a questionnaire soliciting an opinion as to whether Plaintiff's August 15, 2007 work injury caused, contributed to, exacerbated, or aggravated Plaintiff's back and hip complaints, Dr. Turnbull responded that the work injury significantly exacerbated or aggravated Plaintiff's pre-existing back and hip problems. In addition, Dr. Turnbull opined that Plaintiff's August 15, 2007 work injury aggravated her pre-existing knee condition.
18. At Dr. Turnbull's deposition, he opined that Plaintiff's August 15, 2007 work injury exacerbated and/or aggravated her left knee condition due to the significant injury and loss of flesh to the soft tissue of the left leg which caused increased stress and strain, based upon his understanding of how the injury occurred. He also opined that Plaintiff's work injury also either caused or contributed to her hip and back complaints, considering the amount of injury that she sustained, and that the age-related degeneration seen in Plaintiff's most recent lumbar MRI and x-rays from October 2009 would not account for her hip and back pain complaints following the August 15, 2007 work injury.
19. With respect to Plaintiff's back, Dr. Karegeannes was of the opinion that the degenerative findings present in Plaintiff's spine would be exacerbated by her obesity, and that Plaintiff's pre-existing osteoarthritis would be expected to affect her ambulation, which in turn would exacerbate any arthritis in the back. After being presented with a hypothetical posed by Plaintiff's counsel and being provided with information regarding Plaintiff's prior medical history, Dr. Karegeannes opined that it was "quite possible" that Plaintiff's August 15, 2007 work injury aggravated her back pain due to "the timing of the onset of symptoms following the *Page 9 
injury," and that the hip pain was actually referred back pain, thereby making it aggravated by the work injury. He felt that it was "also possible that she [Plaintiff] aggravated her preexisting lumbar spine arthritis from an alteration in her gait secondary to the injury to the left leg," and that this "would be I think the best way to link the two processes." Additionally, Dr. Karegeannes testified that "injury to the muscles in the [left] leg, perhaps from scarring from the surgeries . . . could lead to a change in how she [Plaintiff] carries the leg and how she ambulates which would then throw off her back."
20. The Full Commission gives greater weight to the opinion testimony of Dr. Turnbull over any contrary testimony of Dr. Karegeannes on the causal relationship between Plaintiff work injury and the worsening of symptoms in her left knee, hip and back. The evidence presented is insufficient to prove a causal relationship between Plaintiff's August 15, 2007 work injury and her right knee complaints.
21. On September 10, 2009, Dr. Dennis Hoogerman, whom Plaintiff's counsel retained to evaluate whether Plaintiff sustained any psychological impairment related to her August 15, 2007 work injury, administered a battery of standardized tests to Plaintiff over several hours. He tested Plaintiff's memory, concentration, and attention abilities. Plaintiff's test results indicated that she performed in the 87th percentile. Plaintiff voiced no difficulties with completing the tests, or otherwise assisting Dr. Hoogerman in completing his evaluation.
22. Dr. Hoogerman also completed a Social Security Administration questionnaire addressing employment-related limitations in a variety of categories. On the questionnaire, Dr. Hoogerman rated Plaintiff's limitations on a scale ranging from "no limitation" to "severely limited," which was defined as precluding all useful ability to function in a particular area. Dr. Hoogerman did not rate Plaintiff as being "severely limited" in any category. *Page 10 
23. According to Dr. Hoogerman, Plaintiff suffered from depression prior to her August 15, 2007 work injury due to several childhood traumas, including sexual assault and being abandoned by her mother; however, she was able to cope with these pre-existing traumas by staying busy at work and at home. Once Plaintiff could no longer work or remain as active as she was in her personal/home life following her August 15, 2007 work injury, she became significantly depressed and unable to cope with her feelings. Thus, Dr. Hoogerman was of the opinion that the August 15, 2007 work injury was "a significant factor" and "exacerbated" Plaintiff's underlying depression. Based upon the standardized testing administered to Plaintiff, Dr. Hoogerman opined that she has psychological limitations which impair her ability to return to work and maintain employment. Dr. Hoogerman concluded that Plaintiff is psychologically limited to a moderately-severe degree in her abilities to: maintain concentration; work within a schedule; work with others without being distracted by them; complete a normal workday without interruptions from psychologically-based symptoms; interact appropriately with the public; request assistance; understand simple tasks; respond appropriately to criticism from supervisors; and get along with co-workers or other people.
24. At Dr. Hoogerman's deposition, he acknowledged that he was unaware at the time of his September 10, 2009 evaluation that Plaintiff accompanies her husband on a weekly basis to a public trade lot where she assists with customer sales transactions, that Plaintiff provides babysitting services for her daughter's twin grandchildren who are toddlers, between the hours of 7:00 a.m. and approximately 4:00 p.m. one day a week and that subsequent to Plaintiff's August 15, 2007 work injury, she went on several family camping trips and other vacations with family and family friends. *Page 11 
25. On September 17, 2009, Mr. Adrian Bentley Hankins, a certified rehabilitation counselor, performed a vocational assessment evaluation of Plaintiff at the request of Plaintiff's counsel. Mr. Hankins administered several standardized tests, including an intelligence test, a wide-range achievement test, a clerical examination, and a memory recall test. Plaintiff scored in the average to high-average percentile ranges on all of the standardized tests except for the clerical test. According to Mr. Hankins, the clerical test measures the test-taker's results against bank employees of all ages. Mr. Hankins further explained that the clerical test does not account for today's reliance on computers, and would not be indicative of Plaintiff's performance in all types of office work.
26. Based upon the standardized testing administered to Plaintiff by both Mr. Hankins and Dr. Hoogerman, as well as other vocationally relevant factors such as age, education, and work experience, Mr. Hankins concluded that Plaintiff is no longer a realistic candidate for employment in her local labor market. In particular, Mr. Hankins based his opinions upon the psychological limitations that Dr. Hoogerman opined Plaintiff has. Mr. Hankins agreed that if the evidence failed to prove that Plaintiff had these psychological limitations, then Plaintiff's ability to return to work would not be limited, as Plaintiff would be intellectually and physically capable of performing most, if not all, of her former job duties with Defendant.
27. Mr. George R. Lentz, Sr., a certified rehabilitation counselor and licensed professional counselor, reviewed Mr. Hankins' assessment and Dr. Hoogerman's report on behalf of Defendant. Mr. Lentz found Mr. Hankins' standardized testing of Plaintiff to be appropriate, but disagreed with his conclusions because, in his opinion, they ignored Plaintiff's transferrable skills and other positive vocational aptitudes demonstrated by the vocational testing. Mr. Lentz performed a transferrable skills analysis using accepted federal Department of *Page 12 
Transportation classifications and software programs, and found that Plaintiff possessed a number of transferable skills that would translate into alternative employment opportunities for her.
28. Based upon Plaintiff's positive work history, as well as her educational background, Mr. Lentz was of the opinion that Plaintiff is not permanently and totally disabled, and that there are jobs that she can perform. Mr. Lentz based the labor market search that he performed upon the same pre-injury occupation classification as that upon which Mr. Hankins based his opinions. Greater weight is given to the opinions of Mr. Lentz on Plaintiff's ability to work over any contrary opinions of Mr. Hankins and Dr. Hoogerman.
29. Plaintiff testified that she intended to obtain employment with Lowe's home improvement store following her retirement. Although Plaintiff testified that she picked up application paperwork from Lowe's, there is no evidence that she submitted an application to Lowe's. In addition, although Plaintiff testified that she contacted the Employment Security Commission of North Carolina regarding possible employment opportunities, there is no evidence that she applied for any specific jobs there.
30. Plaintiff also testified that she intended to renovate houses and sell them with her husband after her retirement. Plaintiff's husband testified that they sold the only house that they "flipped" at the downward spiral of the real estate collapse. After the real estate collapse, Plaintiff's husband testified that they purchased no additional homes to "flip."
31. Plaintiff continues to perform household cooking and cleaning duties in her home, and is able to go to the grocery store and run errands. She attends church on a weekly basis and continues to garden. Plaintiff does not use her cane around the house or when walking on level surfaces. *Page 13 
32. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff has met her burden of proving that her August 15, 2007 work injury contributed to, and/or aggravated her left knee, hip and back conditions.
33. The Full Commission finds that Plaintiff is at maximum medical improvement with respect to her left thigh injury.
34. The medical treatment Plaintiff received for her left thigh, left knee, hip and back was reasonably required to effect a cure, to give relief, and/or to lessen her period of disability with respect to her August 15, 2007 work injury. The Full Commission further finds that there is a substantial likelihood that additional treatment will be needed for Plaintiff's left knee, hip and back for symptoms related to her work injury.
35. The Full Commission gives greater weight to the opinion testimony of Mr. Lentz over any contrary opinions of Mr. Hankins regarding Plaintiff's ability to compete for suitable employment within her work restrictions in the competitive labor market.
36. Plaintiff proved disability from the date of her injury through January 31, 2008. Although none of Plaintiff's treating physicians ever removed her from work for a period greater than seven days following her August 15, 2007 work injury and did not issue any permanent restrictions on Plaintiff's ability to return to work, the Full Commission finds based upon the greater weight of the evidence that Plaintiff was incapable of earning any wages during the first week following her work injury when she returned to work but spent all of her time in the medical department.
37. Plaintiff has proven she was incapable of working during the period after the first week following her injury through the date of her planned retirement on August 31, 2007. Beginning the week after Plaintiff's August 15, 2007 work injury, Defendant provided her with *Page 14 
accommodated, sedentary work through August 31, 2007. During this time period, Plaintiff's husband continued to drive her to work, and one of her co-workers would then drive her in a golf cart to her work area, assist her in sitting in a chair and elevating her left leg, and then she would remain seated and watch boxes go by. Plaintiff never returned to her original employment duties. The Full Commission finds Plaintiff's testimony regarding her attempt to return to work following her August 15, 2007 work injury to be credible. Since Plaintiff continued to receive her full rate of pay during this time period, no temporary total disability compensation is owed to Plaintiff for the period from August 15, through August 31, 2007.
38. The Full Commission finds, based upon the greater weight of the evidence, that from August 31, 2007 through January 31, 2008, when Dr. Arnold released Plaintiff from his care, it would have been futile for Plaintiff to seek suitable employment, considering her medical and physical limitations as a result of the "non-healing" of her left thigh, which required three surgical procedures, the use of a wound vacuum and a skin graft. During this period of time, it would have been futile for Plaintiff to attempt to locate suitable employment. Thus, Plaintiff proved that she was temporarily and totally disabled from any employment from August 31, 2007 through January 31, 2008. Additionally, Plaintiff was medically disabled while hospitalized from January 4, 2008 through January 8, 2008.
39. Plaintiff has not proven disability after January 31, 2008. Dr. Karegeannes was of the opinion that she "potentially could go back [to work] with limited duty . . . with precautions directed toward . . . the source of pain in the spine," depending upon the degree of pain she was having and what type of work she was doing. Dr. Turnbull's testimony concerning estimated periods of time he believed Plaintiff would have been unable to work following her surgeries is *Page 15 
speculative and not supported by any competent evidence. Additionally, the Full Commission has found the vocational opinions of Mr. Lentz to be more persuasive than that of Mr. Hankins.
40. Following January 31, 2008 Plaintiff did not make reasonable efforts to find suitable employment.
41. Defendant had reasonable grounds to defend this claim relating to the left knee, hip, and back.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On August 15, 2007, Plaintiff sustained compensable injuries by accident arising out of and in the course of her employment with Defendant when her left leg became pinned between a conveyor belt and an automated guided vehicle. N.C. Gen. Stat. § 97-2(6) (2009).
2. Plaintiff's August 15, 2007 work injury caused a laceration-type injury to her left thigh, and significantly aggravated and exacerbated her pre-existing left knee, hip, and back conditions. Cannon v. Goodyear Tire and Rubber Co.,171 N.C. App 254, 614 S.E.2d 440 (2005). The significant aggravation and exacerbation of Plaintiff's pre-existing left knee, hip, and back conditions was a direct and natural consequence of her August 15, 2007 work injury. Roper v. J.P.Stevens Co., 65 N.C. App. 69, 308 S.E.2d 485 (1983).
3. Plaintiff failed to prove that her August 15, 2007 work injury caused or contributed to her right knee complaints. Young v.Hickory Bus. Furn., 353 N.C. 227, 538 S.E.2d 912 (2000);Click v. Pilot Freight Carriers,300 N.C. 164, 265 S.E. 2d 389 (1980). *Page 16 
4. The medical treatment Plaintiff received with respect to her August 15, 2007 work injury to her left thigh, knee, hip, and back was reasonably necessary in order to effect a cure, to give relief, and/or to lessen her period of disability, and Defendant is obligated to pay for all reasonably required medical treatment due to her compensable work injuries. There is a substantial likelihood that Plaintiff will need future medical treatment for her back, left knee and hip. Plaintiff has reached maximum medical improvement with respect to her left thigh injury. N.C. Gen. Stat. §§ 97-2(19),97-25, 97-25.1 (2009).
5. Dr. Turnbull is hereby designated as Plaintiff's authorized treating physician. N.C. Gen. Stat. § 97-25 (2009).
7. As a result of her injury, Plaintiff was medically unable to perform "real work" from August 15, 2007 through August 31, 2007. Since Plaintiff received her full salary during this period, no temporary total disability compensation is owed. From August 31, 2007 through January 31, 2008, when Dr. Laurence Ian Arnold released Plaintiff from his care, it would have been futile for Plaintiff to seek suitable employment, considering her medical and physical limitations as a result of the failure of her left thigh to heal after the August 15, 2007 work injury. Therefore, Plaintiff is entitled to temporary total disability compensation in the amount of $523.13 per week from August 31, 2007 through January 31, 2008. N.C. Gen. Stat. § 97-29 (2009); Russell v. LowesProd. Distrib.,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following: *Page 17 
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendant shall pay temporary total disability compensation to Plaintiff at the rate of $523.13 per week from August 31, 2007 through January 31, 2008. Any accrued compensation shall be paid in a lump sum.
2. Defendant shall pay all medical expenses incurred or to be incurred as a result of Plaintiff's August 15, 2007 work injury to her left thigh, back and left knee for so long as such evaluations, examinations, and treatments may reasonably be required to effect a cure, to give relief, and/or to lessen her period of disability, in accordance with the provisions of the North Carolina Workers' Compensation Act.
3. A reasonable attorney's fee of 25 percent of the compensation due Plaintiff under paragraph one is approved for Plaintiff's counsel, to be deducted and paid directly to Plaintiff's counsel from the compensation due Plaintiff.
4. Defendants shall pay the costs of these proceedings.
This the __ day of December 2010.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1